**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| KIPP DODDS, Individually and on Behalf of All Others Similarly Situated, ) ) ) | |
| Plaintiff, ) ) | Case No. |
| v. ) ) | **CLASS ACTION COMPLAINT FOR** |
| B/E AEROSPACE, INC., AMIN J. ) KHOURY, JAMES F. ALBAUGH, ) DAVID J. ANDERSON, RICHARD G. ) HAMERMESH, JONATHAN M. ) SCHOFIELD, MARY M. ) VANDEWEGHE, and JOHN T. WHATES, ) ) | **VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** **JURY TRIAL DEMANDED** |
| Defendants. ) | |

Plaintiff Kipp Dodds ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

<u>**NATURE OF THE ACTION**</u>

1. This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of B/E Aerospace, Inc. ("B/E Aerospace" or the "Company") against B/E Aerospace and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with B/E Aerospace, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9 and 17 C.F.R. § 244.100, in connection with the proposed merger between B/E Aerospace and Quarterback Merger Sub Corp. ("Merger Sub"), a wholly owned subsidiary of Rockwell Collins, Inc. ("Rockwell Collins").

2.      On October 23, 2016, B/E Aerospace announced that it had entered into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which Merger Sub will merge with and into B/E Aerospace, with B/E Aerospace continuing as the surviving corporation and as a wholly owned subsidiary of Rockwell Collins (the "Proposed Transaction").  Pursuant to the terms of the Merger Agreement, B/E Aerospace shareholders will receive $34.10 in cash and the equivalent of $27.90 in Rockwell Collins common stock, subject to a two-way 7.5% collar (the "Merger Consideration").[1]

3.      The Merger Consideration is insufficient and undervalues the Company.  Indeed, analysts at Deutsche Bank AG set a $66.00 price target for shares of B/E Aerospace common stock as of October 6, 2016, and the financial analyses performed by B/E Aerospace's financial advisors indicate the Company is worth as much as $73.02 per share.  Furthermore, as outlined below, the Merger Consideration is the result of a flawed sales process.

4.      On November 23, 2016, in order to convince B/E Aerospace's shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading joint proxy statement/prospectus (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.  In particular, the Proxy contains materially incomplete and misleading information concerning: (i) the background to the Proposed Transaction; (ii) financial projections for the Company and Rockwell Collins; and (iii) the valuation analyses performed by the Company's financial advisors, Citigroup Global Markets Inc. ("Citigroup") and Goldman, Sachs & Co.

---

[1] Pursuant to which, if the volume-weighted average price per share of the Rockwell Collins Common Stock on the New York Stock Exchange for the 20 consecutive trading days ending immediately prior to the closing date (the "Measurement Price") is greater than $89.97, the Stock Consideration shall be 0.3101, and if the Measurement Price is less than $77.41, the Stock Consideration shall be 0.3604.

("Goldman") in support of their fairness opinions.  The special meeting of B/E Aerospace shareholders to vote on the Proposed Transaction is forthcoming.  It is imperative that the material information that has been omitted from the Proxy is disclosed to the Company's shareholders prior to the forthcoming shareholder vote so that they can properly exercise their corporate suffrage rights.

5.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against B/E Aerospace and the Board for violations of Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 and 17 C.F.R. § 244.100.  Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to B/E Aerospace shareholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

7.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

8.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C.

§ 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) B/E Aerospace maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

9.      Plaintiff is, and at all relevant times has been, a shareholder of B/E Aerospace.

10.     Defendant B/E Aerospace is incorporated in Delaware and maintains its principal executive offices in Wellington, Florida.  The Company manufactures interior products for commercial and general aviation aircraft cabins.  The Company serves major airlines and various general aviation customers and airframe manufacturers.  Its products include a variety of aircraft seating products, food and beverage preparation and storage equipment, cabin interior structures, and oxygen delivery systems.

11.     Individual Defendant Amin J. Khoury is, and has been at all relevant times, a Company director.  He has been the Executive Chairman of the Board of Directors since December 16, 2014, and was previously the Chairman of the Board of Directors from July 1987 when he co-founded the Company.  Mr. Khoury also served as the Company's Co-Chief Executive Officer from January 1, 2014 through December 15, 2014, and Chief Executive Officer from July 1987 through April 1996 and again from December 31, 2005 through December 31, 2013.  Mr. Khoury has been Chairman of the Board of Directors and Chief Executive Officer of KLX Inc. since October 2014.  From 1986 until April 2012, Mr. Khoury

was a director of Synthes, Inc.  Mr. Khoury was a Trustee of the Scripps Research Institute from 2008 to 2014.

12.     Individual Defendant James F. Albaugh is, and has been at all relevant times, a Company director.  He has been a director since November 2014. Mr. Albaugh has been a Senior Advisor to The Blackstone Group since December 2012. Prior to that, he was president and chief executive officer of Boeing's Commercial Airplanes business unit and a member of Boeing's Executive Council from September 2009 through June 2012. Mr. Albaugh was president and chief executive officer of Boeing's Integrated Defense Systems business unit from July 2002 to September 2009. Prior to that time, Mr. Albaugh, who joined Boeing in 1975, held various executive positions, including president and chief executive of Space and Communications and president of Space Transportation. He is an honorary fellow of the American Institute of Aeronautics and Astronautics, and an elected member of the National Academy of Engineering. He is the President of the American Institute of Aeronautics and Astronautics, serves as a director to the American Airlines Group Inc., TRW Automotive Holdings Corp. and serves on other nonprofit organization boards and in other professional organizations.

13.     Individual Defendant David J. Anderson is, and has been at all relevant times, a Company director.  He has been a director since June 2014. Mr. Anderson has recently retired from Honeywell International Inc. where he was the Senior Vice President and Chief Financial Officer from 2003 until his retirement in April 2014.  While at Honeywell Mr. Anderson was a member of the senior leadership team where he was responsible for the company's Corporate Finance activities including tax, accounting, treasury, audit, investment, financial planning, acquisitions and real estate.  Mr. Anderson was integral to the reshaping of Honeywell's portfolio including supporting nearly $10 billion of acquisitions in higher growth, global

markets. Prior to joining Honeywell, Mr. Anderson had senior financial roles at ITT Industries, Inc., Newport News Shipbuilding and RJR Nabisco Holding Corporation.

14. Individual Defendant Richard G. Hamermesh is, and has been at all relevant times, a Company director. He has been a Director since July 1987. Dr. Hamermesh has been a Professor of Management Practice at Harvard Business School since July 1, 2002. From 1987 to 2001, he was a co-founder and a Managing Partner of The Center for Executive Development, an executive education and development consulting firm. He is also an active investor and entrepreneur, having participated as a principal, director and investor in the founding and early stages of more than 15 organizations.

15. Individual Defendant Jonathan M. Schofield is, and has been at all relevant times, a Company director. He has been a Director since April 2001. From December 1992 through February 2000, Mr. Schofield served as Chairman and CEO of Airbus North America Holdings, a subsidiary of Airbus Industrie, a manufacturer of large civil aircraft. Mr. Schofield served as Chairman of Airbus North America from February 2000 until his retirement in March 2001. Prior to 1989, Mr. Schofield served in various executive positions at Pratt & Whitney, a division of United Technologies Corporation. From 1989 until he joined Airbus, Mr. Schofield was President of United Technologies International Corporation. Mr. Schofield is currently a member of the Board of Directors of Nordam Group and is a trustee of LIFT Trust. Mr. Schofield became a member of the Ordre national de la Légion d'honneur in 2002.

16. Individual Defendant Mary M. VanDeWeghe is, and has been at all relevant times, a Company director. She is the Chief Executive Officer and President of Forte Consulting Inc., a financial and management consulting firm, and a Professor of the Practice of Finance at Georgetown University's McDonough School of Business. Prior to holding her current

positions, Ms. VanDeWeghe served as Senior Vice President of Finance for Lockheed Martin Corporation, and previously held positions in corporate finance, capital markets and general management at J.P. Morgan, where she rose to the rank of Managing Director.  Ms. VanDeWeghe currently serves on the board of directors of W.P. Carey (NYSE) and Brown Advisory, a privately held investment management company.  She previously served on the board of directors of Ecolab Inc. (NYSE) and Nalco (NYSE).

17.     Individual Defendant John T. Whates is, and has been at all relevant times, a Company director.  He has been a Director since February 2012.  Mr. Whates has been an independent tax advisor and involved in venture capital and private investing since 2005.  He is Chairman of the Board of Dynamic Healthcare Systems, Inc., a company that provides enterprise technology software solutions to healthcare organizations. From 1994 to 2011, Mr. Whates was a tax and financial advisor to our Company, providing business and tax advice on essentially all of our significant strategic acquisitions.  Previously, Mr. Whates was a tax partner in several of the largest public accounting firms, most recently leading the High Technology Group Tax Practice of Deloitte LLP in Orange County, California.

## CLASS ACTION ALLEGATIONS

18.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of B/E Aerospace (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

19.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable.  As of October 25, 2016, there were approximately 101 million shares of B/E Aerospace

common stock outstanding, held by thousands of individuals and entities scattered throughout the country.  The actual number of public shareholders of B/E Aerospace will be ascertained through discovery;

      b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

            i)     whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9;

            ii)     whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

            iii)     whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading Proxy.

      c.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

      d.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

      e.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual

members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

   f. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

   g. A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

**I.** **The Merger Consideration is the Result of a Flawed Sales Process and Fails to Adequately Compensate Plaintiff and the Class for Their B/E Aerospace Shares**

  20. B/E Aerospace was founded in 1987 and is headquartered in Wellington, Florida. The Company designs, manufactures, sells, and services cabin interior products for commercial aircraft and business jets in the United States, Europe, Asia, Pacific Rim, the Middle East, and internationally.  Its Commercial Aircraft segment offers first class, business class, tourist class, and regional aircraft seats, as well as spares; oxygen storage, distribution, and delivery systems for commercial and business jet aircraft; coffee makers/water boilers, ovens, and refrigeration equipment; and modular lavatory, wastewater management, and galley systems. This segment also provides engineering, design, integration, installation, and certification services for commercial aircraft passenger cabin interiors; services to design, manage, integrate, test, and certify reconfigurations and modifications for commercial aircraft, as well as to manufacture engineering kits and interface components; and interior reconfiguration services.  The Company's Business Jet segment provides jet seating and sofa products, including electric fully berthing lie-flat seats, direct and indirect lighting, air valves, and oxygen delivery systems, as well as sidewalls, bulkheads, credenzas, closets, galley structures, lavatories, wastewater

systems, and tables; super first class cabin interior products for commercial wide-body aircraft; and lightweight helicopter seats for double engine helicopter airframes for civil and military applications. It serves airlines; aircraft leasing companies; maintenance, repair, and overhaul providers; airframe manufacturers; and other commercial aircraft operators.

21.     The Merger Consideration B/E Aerospace shareholders stand to receive if the Proposed Transaction is consummated fails to adequately compensate them for their shares.

22.     The offer price is below the price target analysts have set for the Company, and is significantly below the share price indicated by certain valuation analyses performed by the Company's financial advisors.  The Merger Consideration also represents a measly premium compared to the Company's 52-week high closing price.

23.     The Merger Consideration is also inadequate in light of the Company's recent financial performance.  On October 23, 2016, the Company announced that its third quarter results exceeded analysts' expectations.  Specifically, the Company announced: Revenues of $733 million reflected organic revenue growth of 8 percent; Operating earnings of $132 million increased 6 percent; and net earnings per diluted share were $0.83 and increased 14 percent.  The Company now expects a full year 2016 revenue growth rate of approximately 6 percent and has raised its 2016 full year net earnings and net earnings per diluted share guidance.

24.     The inadequate Merger Consideration is the result of a flawed sales process. Specifically, the Proxy indicates that the Board decided not to expand its search for strategic alternatives to maximize shareholder value with other third parties, despite the fact that the Company's financial advisors provided the Board with an overview of potential transaction partners other than Rockwell Collins.

25.     Furthermore, while negotiations regarding significant terms of the Merger
Agreement were ongoing, Rockwell Collins indicated that it was interested in retaining Werner
Lieberherr, B/E Aeropsace's President and Chief Executive Officer, as an executive of the post-
close company.  Mr. Lieberherr and other undisclosed members of the Company's management
team will continue to run a segment of the post-close combined company.  The Proxy fails to
provide sufficient details regarding when discussions concerning management's post-close
employment occurred and who was involved in such discussions, and shareholders are therefore
unable to assess the significance of this conflict of interest.

26.     In sum, the Merger Consideration fails to adequately compensate B/E Aerospace
shareholders, and is the resulted of a flawed sales process during which Company management
and the Board failed to conduct a sufficient and robust review of strategic alternatives and
instead focused on procuring unique personal benefits for themselves.

## II.     The Merger Agreement's Deal Protection Provisions Deter Superior Offers

27.     In addition to failing to conduct a fair and reasonable sales process, the Individual
Defendants agreed to certain deal protection provisions in the Merger Agreement that operate
conjunctively to deter other suitors from submitting a superior offer for B/E Aerospace.

28.     First, the Merger Agreement contains a no solicitation provision that prohibits the
Company or the Individual Defendants from taking any affirmative action to obtain a better deal
for B/E Aerospace shareholders.  Specifically, the Merger Agreement states that the Company
and the Individual Defendants shall not: (i) initiate, solicit, propose or knowingly encourage or
knowingly facilitate any inquiry or the making of any proposal or offer that constitutes, or would
reasonably be expected to lead to, an Acquisition Proposal; (ii) engage in, continue or otherwise
participate in any discussions or negotiations relating to any Acquisition Proposal (other than to

state that the terms of this provision prohibit such discussions); or (iii) provide any non-public information to any Person in connection with any Acquisition Proposal.

29.     Additionally, the Merger Agreement grants Rockwell Collins recurring and unlimited matching rights, which provides it with: (i) unfettered access to confidential, non-public information about competing proposals from third parties which it can use to prepare a matching bid; and (ii) several days to negotiate with B/E Aerospace, amend the terms of the Merger Agreement and make a counter-offer in the event a superior offer is received.

30.     The non-solicitation and matching rights provisions essentially ensure that a superior bidder will not emerge, as any potential suitor will undoubtedly be deterred from expending the time, cost, and effort of making a superior proposal while knowing that Rockwell Collins can easily foreclose a competing bid.  As a result, these provisions unreasonably favor Rockwell, to the detriment of B/E Aerospace's public shareholders.

31.     Lastly, the Merger Agreement provides that B/E Aerospace must pay Rockwell Collins a termination fee of $200 million in the event the Company elects to terminate the Merger Agreement to pursue a superior proposal.  The termination fee provision further ensures that no competing offer will emerge, as any competing bidder would have to pay a naked premium for the right to provide B/E Aerospace shareholders with a superior offer.

32.     Ultimately, these preclusive deal protection provisions restrain B/E Aerospace's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.

33.     Given that the preclusive deal protection provisions in the Merger Agreement impede a superior bidder from emerging, it is imperative that B/E Aerospace's shareholders receive all material information necessary for them to cast a fully informed vote at the

shareholder meeting concerning the Proposed Transaction.

### III.    The Materially Incomplete and Misleading Proxy

34.    On November 23, 2016, B/E Aerospace filed the Proxy with the SEC in connection with the Proposed Transaction.  The Proxy solicits the Company's shareholders to vote in favor of the Proposed Transaction.  The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

35.    First, the Proxy fails to provide material information concerning the Company's and Rockwell Collins' financial projections.  Specifically, the Proxy provides projections for various non-GAAP metrics including EBIT, EBITDA, and Free Cash Flow, but fails to provide line item projections for the metrics used to calculate these non-GAAP measures or otherwise reconciling the non-GAAP projections to GAAP (*see* Proxy at 90-92).

36.    When a company discloses information in a Proxy that includes non-GAAP financial measures, the Company must also disclose that non-GAAP financial measure along with comparable GAAP measures and a quantitative reconciliation of forward-looking information.  17 C.F.R. § 244.100.

37.    Indeed, the SEC has recently increased its scrutiny of the use of non-GAAP financial measures in communications with shareholders.  The SEC Chairwoman, Mary Jo White, recently stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as B/E Aerospace has included in the Proxy here), implicates the centerpiece of the SEC's disclosures regime:

In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures. I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.

38.     In recent months, the SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heighted its scrutiny of the use of such projections.[2] Indeed, on May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.[3] One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide *any* reconciling metrics that are available without unreasonable efforts.

---

[2] *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[3] *Non-GAAP Financial Measures, Compliance & Disclosure Interpretations*, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2017), https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

39.    The above-referenced line item projections that have been omitted from the Proxy are precisely the types of "reconciling metrics" that the SEC has recently indicated should be disclosed to render non-GAAP financial projections not misleading to shareholders.

40.    Additionally, the Proxy at page 91 provides a "summary of the adjusted B/E Aerospace forecast prepared by Rockwell Collins' management," but fails to include the Free Cash Flow Projections for this forecast, rendering the forecast materially incomplete and misleading.

41.    The Proxy also references "pro forma financial forecasts of the combined companies," Proxy at 60, but fails to disclose such forecasts.  The omission of these forecasts renders the forecasts disclosed in the Proxy and the valuation analyses summarized in the Proxy which relied upon these forecasts materially incomplete and misleading.

42.    The Proxy also fails to provide sufficient information for shareholders to assess the valuation analyses performed by the Company's financial advisors in support of their fairness opinions and to assess certain conflicts of interests the bankers faced.

43.    With respect to financial advisors' *Selected Transactions Analysis* and *Selected Companies Analysis* (Proxy at 84, 88) the Proxy fails to disclose the individual multiples for each transaction and company utilized.  As a result of these omissions, shareholders are unable to assess whether the bankers applied appropriate multiples, or, instead, applied unreasonably low multiples in order to drive down the implied share price ranges.  The omission of such information renders the summaries of these valuation analyses and the implied share price ranges misleading.

44.    Furthermore, according to Bloomberg, Goldman Sachs currently holds 962,375 shares of Rockwell Collins stock, worth $90.9 million based on Rockwell Collins' trading price

as of December 5, 2016.  The Proxy fails to disclose that Goldman Sachs holds such a significant position in Rockwell Collins, and such information is material to shareholders and necessary for them to assess how much weight, if any, to assign to Goldman Sachs' fairness opinion.  The omission of this information renders the vague statement that Goldman Sachs "*may* at any time" hold positions in Rockwell Collins (Proxy at 82) materially incomplete and misleading, because Goldman Sachs does in fact currently hold a significant position in Rockwell Collins.

45.    Lastly, as noted above, The Proxy fails to provide sufficient details regarding when discussions concerning management's post-close employment occurred and who was involved in such discussions.  The omission of such information renders the "background of the merger" and "interests of directors and executive officers in the Merger" sections of the Proxy materially incomplete and misleading, as these sections reference the fact that certain officers have been offered "continued employment…with the surviving company" but fail to provide shareholders with sufficient information to assess the significance of this conflict of interest.

46.    In sum, the omission of the above-referenced information renders statements in the Proxy materially incomplete and misleading in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against B/E Aerospace and the Individual Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 and 17 C.F.R. § 244.100 Promulgated Thereunder)**

47.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

48.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

49.     Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) the background to the Proposed Transaction; (ii) financial projections for the Company and Rockwell Collins; and (iii) the valuation analyses performed by the Company's financial advisors.

50.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

51.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that the financial advisors reviewed and discussed

their financial analyses with the Board, and further states that the Board considered both the financial analyses provided by the financial advisors as well as their fairness opinions and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and Rockwell Collins and the details surrounding management's post-close employment negotiations.  The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to review the bankers' analyses in connection with their receipt of the fairness opinions, question the bankers as to their derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

52.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.  B/E Aerospace is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

53.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations

and omissions are not corrected prior to the vote on the Proposed Transaction.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

54.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

55.     The Individual Defendants acted as controlling persons of B/E Aerospace within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of B/E Aerospace, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

56.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

57.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act

violations alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

58.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

59.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

60.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

61.    Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.    Enjoining Defendants and all persons acting in concert with them from

proceeding with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

      C.    Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

      D.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

      E.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: December 5, 2016

Respectfully submitted,

**SHEPHERD, FINKELMAN, MILLER & SHAH, LLP**

**OF COUNSEL**

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
The Empire State Building
350 Fifth Avenue, 59th Floor
New York, NY 10118
Tel: (212) 971-1341
E-mail: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*

s/ *Scott R. Shepherd*
Scott R. Shepherd (Fl. Bar No. 69655)
Nathan C. Zipperian (Fl. Bar No. 61525)
1625 N. Commerce Parkway
Suite 320
Fort Lauderdale, FL  33326
Telephone: 954/515-0123
Facsimile:  866/300-7367
Email: sshepherd@sfmslaw.com
Email:  nzipperian@sfmslaw.com

*Attorneys for Plaintiff*